GEORGIA FOOTE, RESPONDENT, *v.* UTAH COMMERCIAL AND SAVINGS BANK AND MELVIN E. CUMMINGS, APPELLANTS.

1. *Power to Sell Collateral—Election Between Public and Private Sales—Obligation of Pledgee—Fair Value must be Received.*

   Where the officers of a bank are empowered to sell collateral security upon the failure of the maker of the note to comply with its terms, and the option is given by which they can dispose of stocks, held as security, at public or private sale, and they choose to make the sale public, they must conform to the rules governing public sales, so far as publicity is concerned. The power of sale must be exercised with a view to the interests of the pledgor as well as the pledgee, and the sale should not be forced for barely sufficient money to secure the payment of the debt, when the securities are known to be of more than double the value of the debt.

2. *Id.—Obligations of Pledgee—His Duties as Purchaser.*

When a party who is intrusted with power to sell attempts also to become the purchaser, he will be held to the strictest good faith, and the utmost diligence for the protection of the rights of his principal. If he fails in either, he ought not to be permitted thereby to acquire any irrevocable rights which he can set up against the party whose interests he has sacrificed.

3. *Sale of Stock by Pledgee—Must be Bona Fide Affair.*

Where a cashier of a bank holds stock in trust for another, and uses it, with other security, as collateral in obtaining a loan from a bank, without its present knowledge or approval, and the bank afterwards accepts such note and security, and sells the collateral to itself to pay the note, after it has received notice of the interest of the cestui que trust therein, when the security left by the cashier, outside the trust fund, is more than doubly sufficient to pay the loan, if sold with proper care and diligence, the cestui que trust may, by proper proceeding have the sale of his stock set aside, and a decree entered transferring the stock for his own use.

4. *Agency—Notice of the Principal.*

When an agency is continuous, and concerned with business made up of a long series of transactions of a like nature, and of the same general character, it will be *held* that knowledge acquired as agent in that business in any one or more of the transactions making up from time to time the whole business of the principal is notice to the agent and to the principal, which will affect the latter in any other of these transactions in which the agent is engaged. in which that knowledge is material.

(No. 907.   Decided July 9, 1898.)

Appeal from district court, Salt Lake county; Ogden Hiles. *judge.*

Action by Georgia Foote against the Utah Commercial & Savings Bank, impleaded with another. From a judgment for plaintiff, the bank appeals. *Affirmed.*

*C. W. Morse, Bennett, Harkness, Howatt, Bradley & Rich-ards,* and *Moyle, Zane & Costigan,* for appellant:

The amount of proof required to show that a deed abso-lute is a trust or a mortgage is proof beyond all reasonable controversy.   *Chambers* v. *Emery,* 13 Utah 378; *Ewing* v. *Keith,* 52 Pac. Rep. 4.

Even taking the strained construction that Foote's presence was Mrs. Foote's presence and possession, never-theless the possession of the grantor in a warranty deed, after the execution of the deed, is presumptively under the deed and is not notice of any claim of the grantor. *Dawson* v. *Danbury Bank,* 15 Mich. 489; *Koon* v. *Tramel,* 32 N. W. Rep. 243 (Iowa); *McNeel* v. *Jordan,* 28 Kan. 7; *Van Kuen* v. *R. R. Co.,* 38 N. J. Law 165; *Dodge* v. *Davis,* 52 N. W. Rep. (Iowa) 2; *Exor* v. *Dancke,* 32 Pac. Rep. (Or.) 1045; *Scott* v. *Gallegher,* 14 Ser. & Rawle 333; *Hafter* v. *Strange,* 3 So. Rep. 190 (Miss.); *Eyler* v. *Eyler,* 60 Tex. 315; *Newhall* v. *Pierce,* 5 Pick. 450; *Bloomer* v. *Henderson,* 8 Mich. 404.

The pledge, as soon as the certificates were delivered, became a valid pledge against everybody, provided the bank then did not have notice.   *Parshael* v. *Eggert,* 54 N. Y. 18; *Nelson* v. *Edwards,* 40 Barb. 279; *Greeff* v. *Dicker-hoff,* 5 N. Y. Supp. 16.

In order to charge the bank with notice, it is necessary that the notice should have come to the executive officers of the bank, at a time when they were acting about this loan.   Nothing of this kind is shown, and Cummings ex-pressly disclaims that he ever said anything in regard to the matter to the officers of the bank.   We have already cited 4 Thomp. Corp. sec. 5197, to the effect that notice must come to the directors while acting about the partic-ular transaction.   The knowledge of Cummings, of course,

could not be imputed to the Bank. *Bank of Nephi* v. *Foote*, 12 Utah 157.

The requisites of notice are well settled. It must be strictly proven because the act is a fraud. *Peeples* v. *Reading*, 8 S & R. 484; *Rogers* v. *Wiley*, 56 Am. Dec. 491; *McMechan* v. *Griffing*, 3 Pick. 149.

So the supreme court of the United States says that the question in such a case is not whether he had the means of obtaining, and might by prudent caution have obtained, the knowledge in question, but whether not obtaining it was an act of gross negligence. *Wilson* v. *Wall*, 6 Wall 83; *Lamont* v. *Stimson*, 5 Wis. 443; *De Voss* v. *Richmond*, (Va.) 98 Am. Dec. 646.

In this case what evidence is there to charge the bank with notice of the interest of Mrs. Foote? Simply the inquiry made by Jennings as to what had become of Foote's (not Mrs. Foote's) interest in the mine. Cummings positively assured him that the Foote interest had been lost, and the executive committee had the right to rely upon their vendor's statement, unless there was something in the statement to excite suspicion. *Boyce* v. *Grundy*, 3 Pet. 210; *Bulluck* v. *Holden*, 13 Met. 355; Kerr on Fraud, 237, 238; *Rogers* v. *Jones*, 8 N. H. 264; *Jones* v. *Smith*, 1 Hare 43.

Notice to the clerk keeping accounts would not be notice to the bank. *Goodloe* v. *Godley*, 51 Am. Dec. 159.

Notices contained in newspapers are not notice to the corporation. *Bank* v. *Whitehead*, 10 Watts 397; 36 Am. Dec. 186; *Vernon* v. *Manhattan Co.*, 17 N. Y. 524.

These shares were mining stock, and the strictest rule is held in regard to that species of property, because its value is fluctuating, and as here, liable to sudden changes. *Twin Lick. Oil Co.* v. *Marbury*, 91 U. S. 587; *Clarke* v.

*Hart*, 6 H. L. Cas. 633, 656; *Johnston* v. *Standard Mfg. Co.*, 39 Fed. Rep. 304.

*C. S. Varian* and *E. B. Critchlow*, for respondent:

That the transaction whereby Cummings agreed to procure and deliver the stock certificate was not a pledge, see the following authorities. Jones on Pledges, (1883) sec. 29–30; *City* v. *Olmstead*, 33 Conn. 476; *Christian* v. *Railroad Co.*, 133 U. S. 241; *Casey* v. *Caverarock*, 96 U. S. 477, 490; 2 Thompson Corporations, sec. 2615; Cook on Stockholders, sec. 465; *National Bank* v. *Nelson*, 38 Ga. 391; *Bidstrup* v. *Thompson*, 45 Fed. Rep. 453.

A simple direction to the corporation does not constitute a pledge. Cook on Stockholders (Supra); *Lallande* v. *Ingram*, 19 La. Ann. 364.

Affirming the act of its cashier, and claiming title through that act, it is bound by its knowledge of an infirmity in the title. By the act of ratification his agency is affirmed. *Bank* v. *New Milford*, 36 Conn. 93; *Atlantic Mills* v. *Indian Mills*, 147 Mass. 272; *Thomson H. Elec. Co.* v. *Capital Co.*, 126 C. C. A. 646.

The power of sale was not exercised fairly. The provision in the contract for a public or private sale must be interpreted in the light of reason and the policy of the law. Whatever may be the terms of a contract for a sale of pledged property, it is always understood that a *fair* sale is contemplated. If the sale is private, it is none the less expected that opportunity for bids shall be given. If it be *public*, a competition of bidders is implied from the very word itself. The provision, "without notice," must be construed to mean without notice to the debtor. This is in accordance with the rule requiring a construction favorable for the interests of the pledgor, so far as

is consistent with the rights of pledges. Colebrook Collateral Securities, sec. 118; *Sparhawk* v. *Drexel*, 12 Bank Reg. 450; *Union Trust Co.* v. *Rigdon*, 93 Ill. 466.

MINER, J.:

This action was brought by the plaintiff and respondent. to declare and hold the defendant bank as trustee for the plaintiff's use and benefit of 6,250 shares of the capital stock of the Diamond Coal & Coke Company, standing in the name of the bank. The trial court adjudged the bank a trustee for the plaintiff, and ordered it to deliver the stock, properly indorsed, to the plaintiff, subject to the payment of $843.91 to defendant Cummings. From this decree the bank appeals to this court, assigning errors upon the admission of testimony and upon the findings of the court.

The testimony tends to show, and the court found, among other things: That defendant Cummings was an officer and cashier of the defendant bank until May 13, 1895. That plaintiff was a married woman, and the wife of James E. Foote, and that the matters referred to concerned her separate property. That in November, 1892, plaintiff, Georgia Foote, being the owner of 80 acres of coal land in Wyoming, subject to the paramount title in the United States, entered into an agreement with defendant Cummings whereby, in consideration of the expenditure of money by Cummings, and further considerations for her benefit, plaintiff agreed to sell to Cummings the undivided one-half of said coal land, when the title thereto should be obtained from the United States, for the sum of $1,000, $250 of which sum was to be paid down. That thereafter said plaintiff and Cummings entered into the possession of said property as partners under the name of the Diamond Coal Company, and expended

money in working and developing the mines and selling the output thereof until May or June, 1893, when they ceased to operate the mine. That at this time the defendant bank had knowledge and notice that plaintiff had an interest in said 80 acres of land, and that the Diamond Coal Company was composed of Cummings and the plaintiff. That, when it became necessary to procure title to said lands from the United States, it was agreed between the plaintiff and Cummings that the sum of $1,600, necessary to pay the United States therefor, should be paid by Cummings, and as security for one-half of said sum so advanced by him, and other moneys which had been, or would thereafter be, advanced and expended on the property, the plaintiff would cause title to said lands to be vested in Cummings, by way of a mortgage, and that the legal title to one-half thereof should be held in trust for plaintiff, as security to Cummings. That this agreement was carried out, and upon the final purchase the plaintiff and her husband, in the year 1894, conveyed by warranty deed to Cummings the whole of said 80 acres, to be so held as security in trust for the plaintiff. That the title thereto remained in Cummings until conveyed to the Diamond Coal & Coke Company, hereinafter named. That in March, 1894, plaintiff and defendant Cummings entered into an agreement with other persons for the purpose of establishing the Diamond Coal & Coke Company. That the basis of such corporation was an agreement between plaintiff and Cummings and others whereby said 80 acres owned by the plaintiff and Cummings, the title of which was in Cummings, with other lands adjacent thereto, should be acquired in payment of its capital stock, which stock should be issued to the various owners of the land so conveyed to the corporation. That said

17 UTAH—19

Diamond Coal and Coke Company so formed still exists, with a capital stock of 100,000 shares. That said Cummings subscribed to said articles of incorporation, as incorporated, for 12,500 shares, and the name of plaintiff is nowhere mentioned in said articles. That in payment for said 12,500 shares, Cummings conveyed to the corporation said 80 acres of coal land, and there was issued to him 12,500 shares of stock, as representing the 80 acres of coal land. That, plaintiff being still indebted to Cummings, it was agreed that the stock should all be issued to Cummings, he to hold 6,250 shares thereof to secure said indebtedness from plaintiff, in lieu of the one-half interest in said land. That in 1894, in accordance with the agreement made with all the stockholders of the Diamond Coal & Coke Company, all of said 100,000 shares, including the 12,500 issued to Cummings, evidenced by certificate No. 5, was placed in escrow with the Bank of Commerce, to secure the payment of the said corporation indebtedness to said bank of $10,000, upon a promissory note made by all the stockholders, including Cummings. That the plaintiff assented thereto, but did not sign the note or contract. That said certificate of stock, No. 5, remained in escrow as aforesaid until February 27, 1895, when the same was withdrawn from escrow by said Cummings under an agreement with the other stockholders (of which agreement plaintiff had no notice) whereby Cummings agreed to loan the Diamond Coal & Coke Company $5,000 for 90 days, and upon the further agreement that said stock certificate should be replaced in escrow by Cummings, in said Bank of Commerce, immediately upon repayment by the Diamond Coal & Coke Company of the sum so borrowed from him. That thereafter said $5,000 note was paid, but said Cummings did

not replace said certificate of stock with the Bank of Commerce. That the note of $10,000 to the bank had been fully paid by the Diamond Coal & Coke Company. That the board of directors of the defendant bank, prior to the time hereinafter mentioned, appointed P. W. Madsen, Thomas W. Jennings, and T. W. Ellerbeck an executive committee, to receive applications for and make loans. That on May 29, 1894, defendant Cummings made application in writing to the defendant bank for a loan of $5,-000 for six months, and offered to pledge said 12,500 shares of the Diamond Coal & Coke Company stock as security. That thereafter said bank, through its said committee, approved the loan, and Cummings executed to the bank his note for $5,000, due in six months. In this note it was stated that Cummings had deposited with said bank, as collateral security for said note, the 12,500 shares of stock of the Diamond Coal & Coke Company, and other security. That Cummings received the $5,000, and deposited with the bank an order upon the secretary of the Diamond Coal & Coke Company for certificate No. 5, for said 12,500 shares of stock. That in making said $5,000 loan the executive committee of said bank relied upon the 12,500 shares of stock as security for the payment of the note. That on February 21, 1895, said note was past due and unpaid, and said Cummings, without the knowledge of the bank or its officers, executed to the bank his promissory note, dated February 21, 1895, for $8,000, due 90 days from date; and such note recited that there were left as collateral security therefor 12,500 shares of stock of the Diamond Coal & Coke Company, 2,500 shares of Utah Mine stock, 10 shares of Lehi Commercial & Savings Bank stock, 5 shares of Springville Banking Company stock, and 5 shares of Mt. Pleasant Commercial & Savings Bank stock, of the total value of $150,000, for

which a lien was given, with power to sell said collateral, in default of payment, at public or private sale, at the option of the bank, without notice of time or place of sale, and without demand of payment, and said defendant bank was authorized to purchase said securities at such sale. That, upon the execution of said note, said Cummings, who was cashier of said bank, took from said bank $3,000,— the difference between the $5,000 and the $8,000 note. That at this time said certificate of stock for 12,500 shares was not in the possession of Cummings, but was in escrow with the Bank of Commerce. That the order for the 12,-500 shares of stock, but not the stock, remained in the defendant bank after the execution and delivery of the $8,000 note by Cummings. That said $8,000 note was never accepted by the defendant bank as a bona fide transaction, except as to the $5,000 borrowed by Cummings from the bank. That thereafter, between the 27th of February and the 15th of March, 1895, said Cummings, without the knowledge of the defendant bank or its officers, other than himself, placed said certificate for 12,500 shares of stock among the securities of the defendant bank held by it as collateral security for the payment of the $5,000 note. That in May thereafter the president and directors of the defendant bank became advised of the deposit of said certificate of stock, and at this time the defendant bank and its president and directors had notice and knowledge, and means of knowledge, that said stock was not wholly the property of the defendant Cummings, and that one-half of it, to-wit: 6,250 shares thereof, said Cummings held as trustee for the plaintiff, as security for the indebtedness due from plaintiff to him, and not otherwise. That on the 1st day of June, 1895, while said certificate of stock No. 5, for 12,500 shares, was in the possession of said defendant bank, said bank, through its

cashier, James G. Jennings, was expressly notified that one-half of said stock, amounting to 6,250 shares, was the property of the plaintiff, and that she was entitled to the possession thereof on payment of her indebtedness to Cummings. That on the 29th day of June, 1895, said note for $8,000 being due and unpaid, and claiming to act under the conditions of said note, the defendant bank, without giving notice to plaintiff, and without giving public notice or publicity, or any notice, in the presence of its directors and employees offered for sale, and pretended to sell, at the front door of said bank, located on First South street, said 12,500 shares of stock to T. W. Jennings, a director of said bank, who then and there, on behalf of the bank, offered to pay $5,000 therefor, and said stock was declared sold to said Jennings, for said bank, for the sum of $5,000, by the cashier of said bank, which sum, together with other amounts of money derived from the sale of other securities of said Cummings, was credited upon said note of $8,000, and said note was thereupon marked, "Canceled and paid." That plaintiff had no notice or knowledge of such sale until long thereafter. That at the time of such sale said stock was of the value of $1.50 per share. That, after the sale of said stock, Cummings was permitted by said bank to negotiate a sale of a portion of said stock, and in September, 1895, pursuant to said negotiations, said bank sold 6,000 shares of said stock for $5,000. That said bank still has 6,500 shares of said stock in its possession, represented by certificate No. 24, for 6,000 shares, and certificate No. 26, for 500 shares. That in April, 1896, Cummings had a full settlement with the bank, and said bank released said Cummings from all liability to it, including said note of $8,000. That said settlement was made on the basis that the bank had acquired title to said 12,500 shares of stock upon the sale made by it on the

29th day of June, 1895.   That at the time of the bringing of this action there was due from plaintiff to defendant Cummings $843.91, with interest, which sum plaintiff brings into court, and at all times has been ready to pay. That the defendant bank has at all times refused to account for said 6,250 shares of stock, which is now of the value of $2.50 per share, and cannot deliver the same to the plaintiff.

As conclusions of law, the court found that said certificate of stock for 6,250 shares was held by the defendant bank in trust for the plaintiff, subject to a lien by Cummings thereon for $843.91, and ordered that the sale of said stock be declared void, as to 6,250 shares thereof, and that said stock be delivered by the defendant bank into court for the plaintiff upon the payment of said sum of $843.91; and a decree was entered accordingly.

No doubt, the terms of the contract govern the rights of the parties as to the time, place, and notice of sale, and should be strictly pursued, without evasion or deception. The officers of the bank were empowered to sell at public or private sale.   They chose to make the sale public, and were therefore required to conform to the rules governing public sales so far as publicity was concerned.   This they did not do.   The power of sale must be exercised with a view to the interests of the pledgor as well as the pledgee, and the sale should not be forced for barely sufficient money to secure the payment of the debt, when the securities are known to be of more than double the value of the debt.   The pledge, under whom such an authority to sell is vested, must exercise it under a trust for the debtor's benefit as well as his own.   The sale must be fair, and the contract must be construed benignantly for the debtor's interest as well as that of the pledgee.   Coleb. Coll. Sec. § 118; *Trust Co.* v. *Rigdon,* 93 Ill. 458–467;

*Griggs* v. *Day*, (N. Y. App.) 32 Am. St. Rep. 704, note 730 (s. c. 32 N. E. 612); *Montague* v. *Dawes*, 14 Allen, 373.

In *Montague* v. *Dawes, supra*, it is held that: "One who undertakes to execute a power of sale is bound to the observance of good faith, and a suitable regard for the interests of his principal. He cannot shelter himself under a bare literal compliance with the conditions imposed by the terms of the power. He must use a reasonable degree of effort and diligence to secure and protect the interests of the party who intrusts him with the power. A stranger to the proceedings, finding them all correct in form, and purchasing in good faith, may not be affected by his unfaithfulness. But, whenever his proceedings can be set aside without injustice to innocent third parties, it will be done upon proof that they have been conducted in disregard of the rights of the donor of the power. When a party who is intrusted with a power to sell attempts also to become the purchaser, he will be held to the strictest good faith, and the utmost diligence for the protection of the rights of his principal. If he fail in either, he ought not to be permitted thereby to acquire any irrevocable rights which he can set up against the party whose interests he has sacrificed." It is evident to our minds that in the manipulation and conduct of this sale, and in the purchase of the stock, the bank did not exhibit that fair, benignant, strict good faith, and reasonable degree of effort and diligence, that was justly required, in order to secure and protect the interests of the party who intrusted it with the power.

By agreement in writing, the directors of the Diamond Coal & Coke Company borrowed of the Bank of Commerce $10,000, and placed its stock, including the stock in question, in escrow to secure its payment. Those failing to pay their share of the note were to have their stock trans-

ferred to those who paid the note. The certificates of stock were issued and put up as such security in September, 1894. The note for $5,000 given by Cummings to the defendant bank, due December 11, 1894, had attached to it an order for the 12,500 shares of coal stock as security, but the stock itself was attached to the note held by the Bank of Commerce in escrow. Not being able to pay this $5,000 note to the defendant bank, Cummings appropriated $3,000 more from the bank, and gave his note to the bank for $8,000, without its knowledge, and then took up the prior $5,000 note, and attached the same prior order for the stock to this $8,000 note, and described the same as the stock in the note which was still in escrow in the Bank of Commerce. Six days later—on February 27, 1895—Cummings offered to loan the Diamond Coal & Coke Company $5,000, on condition that he be permitted to withdraw the 12,500 shares of stock previously placed in escrow. This was granted on condition that when the $5,000 note was paid the stock should again be returned to the bank, to be held in escrow as before. Thereupon this 12,500 shares of stock was for the first time delivered to Cummings, and he soon thereafter placed it in the note pouch of the defendant bank, together with the $8,000 note. His irregularities with the bank being discovered, Cummings was discharged May 14, 1895. The remaining $5,000 note, due from the Diamond Coal & Coke Company, became due May 24, 1895, and was presented for payment. The coal company's officer, finding the stock gone, and that it was in the hands of the defendant bank, insisted that it be returned to escrow, for the protection of the $10,000 note previously named. The defendant bank discovered this note and this collateral in the banknote pouch a long time thereafter, and then claimed the security; but not until after it had compelled Cummings to turn over

to the bank all his property, and his wife's property, to secure the note which he had made without its authority. By this peculiar means Cummings placed in the bank the stock he did not own, upon a note to the bank which the bank had not seen, accepted, or had any knowledge of. The bank had not loaned the $8,000 to Cummings either upon the faith of the note or upon the stock. It knew nothing of either at the time the note was made and left in the note pouch of the bank. The bank had not at any time made any inquiry at the office of the Diamond Coal & Coke Company concerning the amount of stock held or owned by Cummings or by plaintiff. It knew of the plaintiff's interest in the stock on or before June 1, 1895. It knew of the deposit of the stock in escrow to secure the promissory note to the Bank of Commerce. It had notice sufficient to put it upon inquiry as to plaintiff's connection with the stock. It knew Cummings did not have the stock in his possession when the $5,000 note was made. Its want of examination into its own affairs, in connection with its financial securities, and the transactions of Cummings with the bank, was careless and negligent. Up to the time of the defalcation the bank had notice of what Cummings knew. Up to that time Cummings was agent and cashier of the bank. Knowledge of the agent is knowledge of the principal. "When an agency is continuous, and concerned with business made up of a long series of transactions of a like nature of the same general character, it will be held that knowledge acquired as agent in that business in any one or more of the transactions making up from time to time the whole business of the principal is notice to the agent and to the principal, which will affect the latter in any other of those transactions in which the agent is engaged, in which that knowledge is material." *Holden* v. *Bank*, 72 N. Y. 286.

It is claimed that the $8,000 note held by the bank was secured by 12,500 shares of this coal stock, 2,500 shares of Utah Mine, and other collateral. By the terms of the note the bank was authorized to sell this collateral at public or private sale without notice, and the bank was authorized to bid at such sale. Upon maturity of the note, the bank officers, without giving notice of any kind to any one, privately agreed among themselves upon the terms of a public sale of these collaterals, and agreed that they would bid $5,000 for the coal stock, $750 for the Utah Mine stock, and certain other sums for the other collateral, sufficient to cover the note; and the cashier was at once notified to proceed with the sale. Thereupon the cashier, together with the officers and clerks of the bank, went to the front door of the bank, upon First South street, and cried the sale. There being no bidders, the coal stock was bid in by T. W. Jennings, for the bank, at $5,000. The Utah Mine stock was also bid in by the bank at $750, and the other articles at other prices. The bank credited the full amount of the purchase price upon the note, amounting to $8,000, in full payment, and canceled the note. Walker and Cummings went to the bank after they heard of the sale, and protested against it. The bank thereupon claimed ownership, and that whatever profits were made should go to the bank. The mining stock was sold for less than one-half its value. The Diamond Coal & Coke Company was sold at 40 cents per share, or $1.10 less than it was worth, as shown by the proof. Within a short time thereafter, through the efforts of Cummings, made prior to the sale, by direction of the officers of the bank, as he claims, the bank sold 6,000 shares of the coal stock for $5,-000, and still had 6,500 shares left. At the time this sale was made the coal stock was worth $18,750. The property sold was worth three times the sum bid at this sale, and

the bank could realize for the coal stock alone more than double the face of the note. By the sale of the 6,000 shares of coal stock at $5,000, and other collaterals at stated prices, for which the same were sold, the bank has already received more than the amount due upon the note, without including therein the 6,250 shares of coal stock claimed by the plaintiff. Under these circumstances, there appears to be no overpowering equity preponderating in favor of the appellant that will justify this court in placing the ownership of this stock in its hands to the injury of the plaintiff. 2 Jones, Mortg. § 1909.

The testimony in this case is very voluminous, and in many respects conflicting. In the discussion of it, we have not deemed it necessary to review the testimony indictated. To do so would require too much time and space, without corresponding benefit to the parties in interest. Upon a careful reading and examination of the testimony, we find that the evidence tended to show that, after the warranty deed was given him, Cummings held one-half of the coal lands so conveyed in trust for the plaintiff, and that, when the Diamond Coal & Coke Company was organized on the basis of said coal lands, 12,500 shares of its stock was subscribed for and delivered to Cummings, but that one-half thereof, consisting of 6,250 shares, belonged to, and was held in trust by Cummings for, the plaintiff, and the defendant bank, through its officers, had notice, and the means of notice, of these facts, and should be charged with notice thereof. By this holding the defendant loses nothing, and the plaintiff recovers what justly belongs to her.

We have given the other questions discussed in the briefs of counsel careful consideration, but are unable to

come to any other conclusion than that now reached. The findings and judgment of the district court are affirmed.

BARTCH, J., concurs.   ZANE, C. J., concurs in the conclusion.