## CLAPP v. ASSOCIATED DEPOSITORS, Inc., TOLEDO, OHIO, et al.
### No. 1603.

District Court, N. D. Ohio, W. D.
June 26, 1940.

Henry A. Middleton and Edwin Williams, both of Toledo, Ohio, for plaintiff.

Donald F. Melhorn and Lehr Fess, both of Toledo, Ohio, for defendants.

KLOEB, District Judge.

This is an action by the widow and executrix of Charles R. Clapp against the various defendants asking for an accounting and other relief with respect to certain collateral pledged by Charles R. Clapp dur-

ing his lifetime to secure a loan made to him by the defendant, The Commerce Guardian Trust & Savings Bank. Plaintiff asks specifically that defendants be enjoined from selling or otherwise disposing of any of the collateral or proceeds thereof now in their respective hands; that they be required to render a full and complete accounting of the pledgor's indebtedness; that any and all sales of collateral be declared void; that the defendants be required to restore said collateral and that a sufficient amount thereof be sold to pay such indebtedness remaining and the balance paid over to the plaintiff; and that such other and further relief be granted as shall be just and proper in the premises.

The defendants are The Commerce Guardian Trust & Savings Bank, hereinafter referred to as the Old Bank, which made the original loan to Charles R. Clapp and to which the latter pledged the collateral in question; The Commerce Guardian Bank, hereinafter referred to as the New Bank, to which was conveyed the corpus of one of the trusts involved herein; Associated Depositors, Inc., which was formed to liquidate the assets of The Commerce Guardian Trust & Savings Bank, and which now holds most of the security or proceeds thereof; and S. H. Squire, Superintendent of Banks of the State of Ohio, hereinafter referred to as the Superintendent, who had charge of the liquidation of The Commerce Guardian Trust & Savings Bank and the administration of its trust agreements.

It appears that during the year 1931 Charles R. Clapp became indebted to the Old Bank in the sum of $56,500. The note evidencing this indebtedness is now in the possession of Associated Depositors, Inc., through purchase. The indebtedness was originally secured by the following collateral: 700 shares of common stock of the National Supply Company; 60 shares of the common stock of the Second Mortgage Securities Company; 15 shares of common stock of Fifty Associates Company; and an assignment by the debtor of his beneficial interest in two real estate trusts, the Old Bank being the trustee. These trusts were entered in the books of the Old Bank as Trust No. 1069, consisting of a parcel of real estate located at Laskey Road and Tremainsville Road, Toledo, Ohio, hereinafter referred to as the Tremainsville property, and Trust No. 1094, consisting of a piece of property known as

Lot 3, Revere Place, Sylvania Avenue, Toledo, Ohio, hereinafter referred to as the Sylvania property. On March 28, 1932, at the request of the Superintendent for more collateral to secure the debt, a piece of real estate located at No. 108 East State Street, Savannah, Georgia, hereinafter referred to as the Savannah property, was added to Trust No. 1094. At the time these various parcels of real estate were deeded to the Old Bank as trustee, the Sylvania property was encumbered with a first mortgage of $17,500, and the Savannah property was subject to a first mortgage on which approximately $10,000 remained unpaid.

On March 20, 1935, the Old Bank resigned as trustee and Mr. Clapp appointed the New Bank as successor trustee. The legal title to both parcels of real estate in Trust No. 1094 was conveyed to the New Bank as trustee, and said trust became known as Trust No. P–444 on the books of the New Bank.

On August 31, 1931, after the original loan and pledge had been made, the Superintendent took possession of all the assets of the Old Bank for the purpose of liquidation and assumed the administration of all the trust estates of said bank.

Charles R. Clapp died in April, 1935. Various payments on the above indebtedness were made during his lifetime. None have been made since his death. His estate was insolvent. Both Mrs. Clapp, the executrix of his estate, and her attorney notified the Superintendent and his representatives that the estate was insolvent and that the collateral would have to be looked to for whatever satisfaction it would bring. On November 21, 1935, plaintiff acknowledged receipt of, and consented to the sale mentioned in a letter addressed to her by the Superintendent. This letter reads in part as follows: "This will advise you that unless said note, together with all interest thereon is paid not later than December 2nd, 1935, the undersigned will, on said date, pursuant to the terms and provisions of said note, offer at public sale at the main office of the Commerce Guardian Bank, 320 Madison Avenue, Toledo, Ohio, all collateral pledged for the repayment of the above note."

Nothing was paid on the note by December 2nd, 1935, and the collateral was sold on that date. The sale was held at 10 A. M. in the hall at the east end of the second floor of the Commerce Guardian Building,

Toledo, Ohio. No effort was made at any time to sell the property to third persons, or to interest prospective bidders in the sale. No announcements were made and no notices given to the public of the time and place of sale, either through posting or through advertisement. Only four persons were present at the sale and all were employees or representatives of the Superintendent. One offered the property for sale and another purchased it for the Superintendent. The amounts for which the collateral was sold were fixed by the Superintendent, but there is no indication that these did not represent the fair market value of the property. The proceeds of the sale were credited on the note and the property turned over to the Superintendent. The itemized account of the sale and proceeds thereof is as follows:

| | |
|---|---|
| 700 shares National Supply Company stock | $13,002.50 |
| Savannah property | 12,000.00 |
| Tremainsville property | 4,000.00 |
| 60 shares Second Mortgage Securities stock | 300.00 |
| 15 shares Fifty Associates stock | 45.00 |
| Sylvania property | No Equity |
| | $29,347.50 |

Thereafter the Superintendent notified plaintiff that the collateral had been sold and sent her itemized statements of the indebtedness showing the deduction on account of the proceeds of the sale of the collateral.

The property thus acquired by the Superintendent was later disposed of by him at private sale as property of the Old Bank. 200 shares of the National Supply Company stock were sold on July 24, 1936, for $10,016.-60, and the remaining 500 shares were sold on July 27, 1936, for $25,135.72. The 60 shares of Second Mortgage Securities Company stock were sold on July 24, 1936, for $300. The 15 shares of The Fifty Associates Company stock were sold on July 26, 1936, for $74.40. The Tremainsville property was sold on November 30, 1936, for $5,950. The Sylvania property was sold October 5, 1939, for $20,000, the purchaser assuming the $17,500 mortgage thereon. The $10,000 remaining on the Savannah property mortgage was taken up by the Superintendent. Later it was turned over to Associated Depositors, Inc., the successor in liquidation, along with all the other assets of the Old Bank. This mortgage was then foreclosed by Associated Depositors, Inc., and the property purchased by it for $7,500. Associated Depositors, Inc., still has title to this property.

Altogether the property thus disposed of by the Superintendent brought in over $25,000 more than he had paid for it at the December 2, 1935, sale. There is no evidence that the amounts received at these subsequent sales did not represent the then fair market value, while there is substantial evidence that the fair market value was received.

Plaintiff, through her attorneys, learned of all the facts surrounding the above sales during the summer of 1937, and on August 28, 1937, made a demand for all the collateral, claiming that the December 2, 1935, sale and the subsequent sales were invalid, and asked for the restoration of all the collateral or the market value as of the date of demand. This was refused and the instant suit was filed on November 2, 1937. The National Supply Company stock had increased in value considerably at this time, so that its value alone was equivalent to more than the entire indebtedness. Since that time there has been some decrease in market value.

Plaintiff contends (1) that the December 2, 1935, sale was void because the Superintendent had notified plaintiff that it would be a public sale, whereas in fact it was not; (2) that the subsequent private sales were invalid because (a) it was the duty of the Superintendent to notify plaintiff of all the facts surrounding the first sale and give her a chance a redeem the collateral before any subsequent sale, and (b) they were made by the Superintendent or his successors as his own property and therefore amounted to a conversion; and (3) that the plaintiff has the right to elect between treating the subsequent sales as conversions or demanding a restoration of the collateral at the time of discovering the conversions, and in either case the measure of damages is the highest value of the property between the time of the demand and the date of filing suit, so long as the intervening time is a reasonable time.

*First.* Was the December 2, 1935, sale invalid? The pertinent provisions of the pledge agreement in the instant case are as follows:

"Each of the undersigned agrees that said bank may from time to time call for such additional security as it deems proper, and, upon failure of the undersigned to

furnish same, or upon the nonpayment of this or any of the aforementioned obligations or liabilities, or in the event of insolvency or bankruptcy of the undersigned or any of them, then in any such event said bank may apply to the payment of this and/or all or any of the above mentioned obligations and liabilities, whether due or not, all sums which the undersigned or any of them have on deposit with said bank, and/or collect, and/or transfer into its name or the name of its nominee, and/or sell, assign, transfer and deliver, in whole or in part, at any time or times, the above mentioned property and any additions thereto or substitutions therefor at *any broker's board or at any public or private sale in such manner and upon such terms and conditions as said bank may deem proper, without notice, demand or advertisement of any kind,* and after deducting all costs and expenses of collection, sale and delivery, retain and apply the residue of the proceeds to pay this and/or any or all of the above mentioned obligations and liabilities whether due or not, returning the overplus to the undersigned.

"At any such sale or sales said bank may purchase the whole or any part of the property free from any right of redemption of or accountability to the undersigned which is hereby waived and released." (Italics added.)

Such provisions in pledge agreements are controlling and not against public policy. Glidden v. Mechanics' Nat. Bank, 1895, 53 Ohio St. 588, 42 N.E. 995, 43 L.R.A. 737; In re Mertens, 2 Cir., 1906, 144 F. 818, affirmed, 1907, 206 U.S. 28, 27 S.Ct. 681, 51 L.Ed. 945. It is also settled that the pledgee occupies a fiduciary capacity and as such owes a duty to protect the interests of the pledgor and hence, regardless of the type of sale by the pledgee, it is his duty to obtain the best possible bargain for the pledgor and to make some effort at interesting third parties in the sale of the pledged property, whether he elects to sell at public or private sale. Glidden v. Mechanics' Nat. Bank, 1895, 53 Ohio St. 588, 42 N.E. 995, 43 L.R.A. 737; State Trust & Savings Bank v. Dunn, 5 Cir., 1928, 24 F.2d 477; Foote v. Utah Commercial & Savings Bank, 1898, 17 Utah 283, 54 P. 104; Cole v. Manufacturers Trust Co., N.Y.Sup.Ct., 1937, 164 Misc. 741, 299 N.Y.S. 418; Lowe v. Ozmun, 1906, 3 Cal.App. 387, 86 P. 729; Ohio National Bank v. Central Construction Co., 17 App.D.C. 524.

The Superintendent notified plaintiff that the sale would be a public sale. He was bound by this election, and could not thereafter sell in any other manner. Dulin v. National City Bank, Ind.App., 1921, 130 N.E. 426; Foote v. Utah Commercial & Savings Bank, 1898, 17 Utah 283, 54 P. 104; Amarillo National Bank v. Harrington, 1910, 62 Tex.Civ.App. 179, 131 S.W. 231. It is clear that the requirements for a public sale were not met. There was no notice of any kind made to the public. Dulin v. National City Bank, Ind.App., 1921, 130 N.E. 426; Union & Mercantile Trust Co. v. Harnwell, 1923, 158 Ark. 295, 250 S.W. 321. The only persons present were representatives or employees of the Superintendent. But defendants maintain that the kind of public sale contemplated by the pledge agreement was not a public sale as that term is ordinarily employed but a public sale under the terms and conditions deemed proper by the bank. In other words, it is claimed that the italicized part of the pledge agreement above quoted gave the bank the right to determine the conditions of a public sale as well as of a private sale. I cannot agree with this interpretation. It would render meaningless any distinction between the two terms and leave no reason for the insertion of the first. As said by the court in Union & Mercantile Trust Co. v. Harnwell, 1923, 158 Ark. 295, 250 S.W. 321, 323, "the contract provided that, upon nonpayment of the Wirbel obligation, the appellant could sell the Harnwell note 'at public or private sale at any place in the city of Little Rock without notice.' This language is ambiguous, but it necessarily means that, if the sale were private, it could be made without notice to the pledgor, Wirbel. The parties could not have meant that, if the appellant elected to sell at public sale, no notice of the sale would have to be given to the public. Such a construction of the contract of pledge would render the same contradictory within itself, because a public sale could not be conducted unless the public were invited to participate therein. Such construction of the contract would render the same wholly meaningless."

Defendants also claim that the sale should not be declared invalid because plaintiff received the fair value and hence was not prejudiced. But this is not the proper criterion. The pledgee occupies a fiduciary position and in making a sale of the pledged property has the duty of ob-

taining the best possible price for the property. In Cole v. Manufacturers Trust Co., N.Y.Sup.Ct., 1937, 164 Misc. 741, 299 N.Y. S. 418, 427, the court stated: "Of course, the defendants urge—although it nowhere appears—that the trust company paid the market price for the collateral, and hence plaintiff was not prejudiced by the manner in which it conducted the 'sale.' The point is, however, that the trust company, if it conducted any sale at all, conducted a private sale. It did not sell, or attempt to sell, the stock on the Stock Exchange or at a public sale. At a private sale the market price is not necessarily the criterion of the true value of the securities. * * * As a trustee the pledgee is duty bound to make every reasonable endeavor to obtain the highest price possible, not merely the market price. * * * It made the sale a secret transaction between itself and its nominees. It rendered it impossible to secure any other bid or a better price. Even a private sale, when conducted in the ordinary manner, 'must be fair and open' in order to be valid. * * * The incidental fact that the trust company may actually have paid the market price cannot save the transaction from condemnation or bring it within the purview of the contract."

The power to make the sale came from the pledge agreement. If the conditions therein required were not met, there could be no transfer of title, there were not sufficient acts performed to effect the sale as contemplated by the agreement. Suppose, for example, that the pledge agreement did not authorize the pledgee to sell to himself. The mere fact that he paid the fair value would not validate the sale. The sale could not possibly be valid.

I am of the opinion that the December 2, 1935, sale was invalid for the above reasons.

*Second.* Were the subsequent sales of the property valid as private sales under the terms of the pledge agreement? It has been suggested by the defendants that even if the December 2, 1935, sale was invalid the subsequent sales are valid and within the terms of the pledge agreement.

Plaintiff claims that it was necessary for the Superintendent to notify her that the first sale was invalid and that a second sale would be held, in order to give her a chance to then redeem the property. For this proposition plaintiff relies mostly upon the case of Leahy v. Lobdell, Farwell & Co., 6 Cir., 1897, 80 F. 665, decided in this circuit. But that case is distinguishable from the instant case in that there was no pledge agreement in writing and hence there could never be a sale without notice, whereas here the pledge agreement specifically provided for sale without notice. If it is necessary to give notice of an intended sale of the collateral and such notice is given followed by an invalid or fraudulent (as in the Leahy case) sale, it should obviously be necessary to give another notice of sale before any subsequent sale can be valid. But where no notice is ever necessary, it would seem that the only requirement would be that the conditions under which a sale may be made are present. The sale of December 2, 1935, being invalid, the relationship of the parties did not change and they were still bound by the conditions and terms of the pledge agreement. Glidden v. Mechanics' Nat. Bank, 1895, 53 Ohio St. 588, 42 N.E. 995, 43 L.R.A. 737; Hellman v. Pogue, 1909, 13 Ohio Cir.Ct. R.,N.S., 368, affirmed, 1911, 85 Ohio St. 463, 98 N.E. 1131. Hence if the original pledge agreement was still in force, and that instrument provided for a private sale without notice, it is difficult to see why a notice was necessary. There is no claim of fraud here; on the other hand, it is evident that the Superintendent acted in good faith throughout. Undoubtedly he obtained the best prices possible.

Plaintiff contends that there was a breach of trust in not notifying her that the first sale of December 2, 1935, was invalid and that there was to be another sale. But how could there be such a duty when the Superintendent acted in good faith throughout and thought that the first sale was valid and still thinks so? To say that there was a breach of trust here is the same as saying that there was fraud; if the trustee knew that the first sale was invalid and still retained the profit realized on the second sale, he would be guilty of fraud in not divulging the profit. The facts here do not warrant such an assumption.

Plaintiff also contends that the subsequent sales amounted to a conversion of the pledged collateral because they were made as owner and not as pledgee. For this position plaintiff relies upon the case of Dibert v. Wernicke, 6 Cir., 1914, 214 F. 673. There the first sale was void because the pledgee was guilty of fraud in covering up the first sale and buying the collateral for

two per cent of its value. The purchaser was a partner to this conspiracy and resold the collateral but refused to apply the proceeds to the note which he also held. The court merely decided that under these facts the subsequent sale could be treated as a conversion in order to credit the pledgor with the full value of the collateral. The instant case differs considerably from the facts in the Dibert case. Here there was no evidence of fraud or unfair dealing by the Superintendent. The fair market value was received and the pledgor will receive full value if these are credited to the indebtedness. It should also be noted that in the Dibert case the subsequent sales were made by a person other than the pledgee. A sale by a third person could not possibly be a sale under the pledge agreement. In the instant case, however, the parties were not affected by the void first sale, and any subsequent sale by the pledgee must be interpreted in the light of the pledge agreement. The pledge agreement authorized such a sale and so it could not be construed to be a conversion.

Merely because the pledgee sold the collateral under the mistaken idea that it actually belonged to him made no difference. Valley National Bank v. Stewart, 1939, 53 Ariz. 328, 89 P.2d 493; Huntington Valley Trust Co. v. Norristown-Penn Trust Co., 1938, 329 Pa. 356, 196 A. 821. In the first of these two cases the original sale was intended to be a public sale but was void because notice of the sale was sent to the pledgor by mail whereas the statute required personal notice. Thereupon the pledgee resold the collateral at a private sale under the terms of the pledge. The court decided that the second sale was valid, though no notice thereof had been given to the pledgor. The court stated [53 Ariz. 328, 89 P.2d 495], "If the public sale was void, it was a nullity and in no manner prevents the making of a private sale, if as a matter of fact the latter was authorized by law, for a void act has no effect." Thus a void act cannot have the effect of putting one of the parties under a duty to give notice if such notice would not be required otherwise.

In the Huntington Valley Trust Co. case, the pledgee sold a mortgage at a supposedly public sale and purchased it for a nominal sum. The sale was void because not a proper public sale. Thereafter the pledgee foreclosed the mortgage and purchased the property. Then he sold the property as his own. The court decided that the last sale of the property could be treated as a private sale under the terms of the pledge agreement.

These two cases satisfactorily meet every objection made to the validity of the second sale.

In addition, there is another reason why the second sales should be upheld. In Hiscock v. Varick Bank of New York, 1907, 206 U.S. 28, 27 S.Ct. 681, 684, 51 L.Ed. 945, the United States Supreme Court said: "The trustee [who represented the pledgor] did not offer to prove that others were prepared to purchase and might have done so but for want of information, or that the policies had a greater value than was realized at the sale, or that he was prepared to redeem the pledge for the benefit of the estate, nor did he offer to do so. There was nothing in the evidence tending to show a wanton sacrifice or an intention to buy in at so inadequate a price as to justify the inference of a fraudulent purpose."

In the instant case plaintiff does not claim that the collateral might have been bought by others had they learned of the sale, or that plaintiff herself was in a position to protect her interests or redeem the collateral. Hence it is hard to see wherein plaintiff was prejudiced.

It is the opinion of the court that the sales subsequent to the December 2, 1935, sale are valid under the pledge agreement. The defendants shall be made to account to plaintiff on the basis of the amounts received on those sales after deducting the expenses chargeable under the pledge agreement.