## DIBERT v. WERNICKE.

(Circuit Court of Appeals, Sixth Circuit. June 16, 1914.)

No. 2266.

1. PLEDGES (§ 56*)—FORECLOSURE—SALE.

Under Voorhies' Rev. Civ. Code La. art. 3165 (3132), p. 558, providing for the foreclosure of pledges, the pledgee of certain bonds was authorized to sell the same on the New Orleans Stock Exchange without appraisement, advertisement, or notice, and to purchase the bonds itself at a fair price.

[Ed. Note.—For other cases, see Pledges; Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

2. PLEDGES (§ 56*)—PLEDGEE—SALE OF SECURITIES—TRUSTEE TO SELL.

Though a pledgee of securities was authorized to sell them without appraisement, advertisement, or notice, and to purchase itself at a fair price, it nevertheless occupied a fiduciary relation to the pledgor as a trustee to sell, with the duty to exercise its right of sale for the benefit of both the pledgor and itself.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

3. PLEDGES (§ 56*)—FORECLOSUE—SALE.

In selling certain bonds on foreclosure of a pledge, the pledgee was required to conduct the sale fairly, in good faith, and with due regard to the rights of the pledgor, exercising reasonable diligence to secure a just price and conserve the interests of the pledgor in so far as consistent with its own protection, especially when at the same time it exercised its right of purchasing at its own sale.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

4. PLEDGES (§ 56*)—FORECLOSURE—INVALID SALE—EFFECT—ACTION TO RECOVER DEBT—EQUITABLE SET-OFF.

Where a pledgee of bonds to secure a note sold the bonds as pledgee, with the intention of exercising the privilege of purchasing at its own sale and for the avowed purpose of acquiring ownership, and carried out such purpose through the co-operation of its selling and purchasing brokers, and with such a lack of publicity and failure to give information as to enable it to acquire the bonds under color of such sale at 2 per cent. of their face value and about 4 per cent. of the amount of its debt, though willing, if necessary, to bid the full amount of the debt in order to acquire them, it was liable to account for the full value of the bonds at the time of the sale by way of equitable set-off in a suit subsequently brought to recover the balance of the debt for which the bonds were pledged, which set-off was available to a surety on the note as against a purchaser thereof with notice after maturity.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 152–183; Dec. Dig. § 56.*]

5. PLEDGES (§ 31*)—PRINCIPAL AND SURETY (§ 114*)—FORECLOSURE—WRONGFUL SALE—CONVERSION—LIABILITY OF SURETY.

Where a pledgee of bonds transferred to secure a note wrongfully sold the same to foreclose the pledge for a small per cent. of their value, purchasing them at its own sale, and thereafter transferred the note and the bonds to a syndicate, using the bonds to purchase the property by which they were secured on foreclosure of the mortgage, there was a conversion of the bonds, and no action could be maintained by the purchaser of the note secured by the bonds against a surety thereon; it appearing that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

214 F.—43

the real value of the bonds exceeded the debt for which they were pledged.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 86–88; Dec. Dig. § 31;* Principal and Surety, Cent. Dig. § 63; Dec. Dig. § 114.*]

Appeal from the Circuit Court of the United States for the Western Division of the Southern District of Ohio; John E. Sater, Judge.

Suit by O. H. L. Wernicke against John Dibert. Decree for complainant, and defendant appeals. Affirmed.

Edward Colston, of Cincinnati, Ohio, for appellant.

Murray Seasongood and R. L. Black, both of Cincinnati, Ohio, for appellee.

Before KNAPPEN, Circuit Judge, and McCALL and SANFORD, District Judges.

SANFORD, District Judge. This is an appeal by Dibert, a citizen of Louisiana, the defendant below, from a decree in equity perpetually enjoining him from prosecuting an action which he had brought on the law side of the court against Wernicke, a citizen of Ohio, the complainant below, upon a promissory note.

The material facts are these: In 1902 and 1903 the Interstate Trust & Banking Co., of New Orleans, hereinafter called the Trust Co., loaned the Hardwood Export Co., of St. Louis, hereinafter called the Hardwood Co., $50,000 upon its various notes, with the pledge, as collateral, of $100,000, par value, of the Hardwood Co.'s bonds. Those bonds were part of an issue of $147,000, secured by deed of trust on about thirty thousand acres of lands, timber interests and leasehold estates in Alabama, on which there were three mills, one of which was then in operation. The Trust Co. then believed that these bonds were reasonably worth fifty cents on the dollar.

This loan was several times renewed. In October, 1903, the renewal not being paid, the Trust Co. gave notice that it would take legal action. Thereupon the complainant Wernicke, who was president of the Wernicke Timber Land Co., a corporation which had in the meantime agreed, conditionally, to purchase a majority of the capital stock of the Hardwood Co. and to liquidate two-thirds of its indebtedness, and who was interested in maintaining its credit pending this contemplated purchase, went to New Orleans with one Smith, the president of the Hardwood Co., who was also the president of the F. H. Smith Lumber Co., hereinafter called the Smith Co., and urged the Trust Co. to again renew the Hardwood Co.'s loan, representing its property to be valuable.

As a result of these conferences the Trust Co. finally, on October 16th, surrendered the $50,000 Hardwood Co. notes which it then held and accepted in lieu thereof its four new notes for the same aggregate amount. Three of these new notes were for $5,000 each. They matured at intervals on and prior to December 15th, and were endorsed by the Smith Co. The other, being the note now in question, was for $35,000. It matured on December 15th, was payable at the

banking house of the Trust Co., and was signed on the back by both the Smith Co. and Wernicke as anomalous endorsers. The $100,000 Hardwood Co. bonds previously pledged were retained by the Trust Co. as collateral security for all of these new notes. This $35,000 note recited the pledging of the bonds as security for all of the notes, and provided that on default in payment of any of them at maturity, the Trust Co. might call for additional security or collateral. It also contained the following provision: "The undersigned hereby gives said trust company  *  *  *  full and irrevocable power  *  *  * upon failure to promptly pay at maturity said note or other liabilities *  *  *  to sell such  *  *  *  collateral without further notice, demand for payment, or putting in default, and without the intervention of any court of justice and without appraisement or advertisement or other notice, at public or private sale or sales or at any broker's board or stock exchange. If said sale or sales shall be public or at any broker's board or stock exchange  *  *  *  said trust company  *  *  * may purchase said property  *  *  *  at such sale or sales, without any right of redemption on the part of the undersigned."

The $5,000 note which first matured was paid shortly after it fell due; and the Trust Co., with Wernicke's consent, thereupon released $10,000 of the collateral bonds. Neither of the other notes were paid at maturity; and all were protested. Both the Hardwood Co. and the Smith Co. executed deeds of assignment shortly before the maturity of the last note; and each proved to be insolvent. The Trust Co. did not, however, at any time make a demand for additional collateral under the terms of the pledge.

On December 31st, the Trust Co. telegraphed Wernicke: "Hardwood note protested. Must take immediate action. Advise at once by wire." To this Wernicke replied, by telegram: "Exhaust your resources on the makers and collateral before looking to me as endorser. Am unable to pay without shifting claim, which is made impossible by recent action of principals." On January 4, 1904, the Trust Co. telegraphed Wernicke: "We look to you for payment Hardwood bearing your endorsement. Must take immediate action." To this. Wernicke replied, by letter: "I am not able at present to take it up, and if you feel that you must commence action to protect yourself, you must proceed against the makers, as well as endorsers, and also exhaust your collateral;" adding that he was satisfied that the Trust Co. would recover the amount due more speedily, and at less expense, by proceeding leniently than by "adopting more stringent methods"; that he understood the Hardwood Co. and the Smith Co. were solvent, but needed time to realize upon their assets, so as to pay everybody in full; and that he himself could do more if allowed a free hand than if the Trust Co. were immediately to begin suit.

On January 7th, Wernicke wrote the Trust Co. that it might be necessary to ask for a receiver of the Hardwood Co. to protect its property for the bondholders; that on account of his interest as indorser he would like to be informed as to the Trust Co.'s views and intentions; and that it seemed to him the bondholders and parties interested in the bonds as collateral should get together and decide

upon some course of action, if this had not been already done. No reply was sent by the Trust Co. to this letter.

On January 16th, the Trust Co. wrote Wernicke that it was holding the bonds as collateral and not as an investment, and at the price it held them, in addition to the endorsers, it seemed that it should have no loss, but that its directors wished the matter closed as soon as possible and had decided to take action against the endorsers; and suggested that it would be better if he should take up the notes, with the collateral, so that he could protect himself against the endorsement in case the concern did not work out as expected, and that by taking such course he would be "absolutely protected." In reply Wernicke wrote, on January 19th, that he expected to visit St. Louis shortly and would look into the situation, and might also visit New Orleans with a view of arranging a plan to protect his contingent interest as endorser in the bonds; that he thought he could interest some acquaintances to assist him in acquiring control of a majority of the bonds; and that if the Trust Co. should commence suit at once it might prevent him from carrying out the plan he had in mind. This letter should have reached New Orleans, in due course of mail, on the night of the 20th.

In the meantime, however, the Trust Co. had sent its attorney to St. Louis in an effort to collect the notes or to sell the notes and collateral bonds. And this effort having been unsuccessful, it had, as testified by its president, at some time prior to January 20th, not precisely shown, turned over the Hardwood Co.'s notes and bonds to its attorney "to take ownership of the pledge which had been held as collateral," that is, "to become owner of the bonds which it had heretofore held as collateral, in the proper legal manner," or, "in other words to foreclose the pledge." His purpose in foreclosing the pledge was, as testified by him, "so as to have ownership" of the collateral; and in turning over the notes and bonds to the attorney he told him that what he wanted done was to "take possession and ownership of the collateral," what "he wanted to accomplish" was to "secure the ownership of that collateral."

In pursuance of these instructions the Trust Co.'s attorney employed a broker to sell the bonds for the Trust Co. on the New Orleans Stock Exchange. He gave this broker no information as to the character or value of the bonds, other than what appeared on their face; and instructed him to employ another broker to buy in the bonds for the Trust Co. at the sale, commencing with a bid of $1,800, and, if necessary, bidding the full amount of the debt. And although the rules of the Exchange required that the selling broker should charge for selling one-fourth of one per cent. of the par value of the bonds, irrespective of the price brought, which would have been $225, he agreed in advance with this selling broker that his compensation should be only $50, out of which he should also pay the compensation of the broker whom he should employ to do the buying.

In accordance with the instructions thus given by the attorney, the selling broker instructed the broker whom he employed to do the buying, that he was to make the first bid for the bonds at $1,800, that

is, at the rate of two cents on the dollar, and that if any one raised his bid, he should go higher and remain the highest bidder up to the full amount of the debt due the Trust Co.

In carrying out these instructions the bonds were sold on the New Orleans Stock Exchange, at the afternoon session, on January 20, 1914. No notice of this sale had been given to either the Hardwood Co., the Smith Co. or Wernicke. Nor had the sale of the bonds been previously advertised in any newspaper or posted on the Exchange; neither such advertisement nor posting being, however, customary in the sale of securities on the Exchange. At the time of the sale the usual number of brokers, about forty or fifty, were present, with perhaps some "visiting members," that is, business men who had the privilege of visiting the Exchange. In making the sale the selling broker merely announced that he had $90,000 of Hardwood Export Co.'s bonds for sale, which he exhibited and offered for sale, and on which he asked for bids; but, although these bonds were not listed on the Exchange, he gave no information as to the character of the bonds, or the purposes of the sale, except that, in answer to an inquiry from a bystander, he stated that the sale was being made to secure a pledge, and showed one of the bonds, without comment, to some of the bystanders, who wanted to look at them to see what they looked like. He did not, however, state the amount for which the bonds were pledged, nor mention the Trust Co. as pledgee, nor offer the bonds for sale in any lots less than the full amount. Except, however, in the matter of the broker's commission, above mentioned, this manner of conducting the sale was, it appears, in accordance with the rules and regulations of the Exchange.

When the bonds were thus offered for sale, the broker employed to buy for the Trust Co., made, in accordance with the previous arrangement, a bid of $1,800, or two cents on the dollar of their par value; and no higher bid having been made, the selling broker, in like accordance with such arrangement, sold the bonds for the Trust Co., at this price, to the broker buying them for the Trust Co. Thereupon, the next day, January 21st, the Trust Co., through a circuitous series of check transactions, with the two brokers as a conduit, paid, as purchaser of the bonds, $1,800, which was repaid to it as holder of the notes. This sum was credited by it ratably on the three notes, that is, $1,400 on the $35,000 note and $200 on each of the $5,000 notes, the broker's fee being apparently overlooked as an expense item; and the $90,000 bonds were re-delivered to it as purchaser.

After such purchase by the Trust Co. there was some further correspondence, in which the fact that the Trust Co. had purchased these bonds was not specifically stated or made clear to Wernicke. Finally, in answer to a telegram from the Trust Co. stating that it was "taking legal action against all parties interested" and advised his coming there, he went to New Orleans on February 9th and there had various conversations with the president of the Trust Co. and one of its directors, in which he was advised of the Trust Co.'s purchase of the bonds; the validity of which he disputed. In these conversations it was stated that the Trust Co. did not wish to speculate or make a profit

out of the bonds, certain of its officers being opposed to that course, and simply desired the return of the money loaned with interest, and that it was willing that Wernicke should either take up the entire loan of $45,000 and all the bonds, or the $35,000 note and $70,000 of the bonds; but Wernicke made no agreement or tender to this effect, being then not in a financial position so to do. It was further stated in one of these conversations by the director of the Trust Co. that a large profit could be made out of the property; and he proposed that if Wernicke would raise $25,000 others should raise a like amount, the sum of $50,000 being estimated as the sum necessary to take up the bonds and pay the cost of foreclosing the mortgage. Wernicke made an effort to secure this $25,000 by interesting another person, but failed.

Subsequently a syndicate was formed, consisting of the president of the Trust Co.; Dibert, a lumber manufacturer and stockholder in the Trust Co.; another stockholder in the Trust Co.; and a firm of which the above-mentioned director of the Trust Co. was a member. This syndicate purchased from the Trust Co. the three Hardwood Co. notes, which it then held and the $90,000 bonds which it had purchased at the stock exchange sale, paying the Trust Co. therefor the full amount of its debt against the Hardwood Co., with interest, and all expenses, that is, something over $57,000; and the three notes and the bonds were thereupon transferred by the Trust Co. to Dibert as holder for the syndicate. It further appears from the testimony of the above-mentioned director that the bonds were not transferred to the syndicate as an incident to a transfer of the notes, but were sold separately, as "separate obligations" held by the Trust Co., the proportionate amount paid for each not, however, appearing.

In March, 1904, Dibert, as assignee of the $35,000 note of the Hardwood Co., brought an action at law in the court below against Wernicke, as signer on the back thereof, alleging that said note was entitled to no other credit than the $1,400 endorsed thereon as of January 21, 1904 (being the pro rata credit from the sale of the bonds on the exchange), and seeking judgment for the balance due, with interest.

On April 1, 1904, the Hardwood Co. made default in the payment of interest on its bonds, and this default having continued for more than ninety days, Dibert, as the holder of more than one-third of the outstanding bonds, in the exercise of an option contained in the deed of trust securing the bonds, declared the whole of the bonded indebtedness to be due and payable, and requested the trustee to enforce the deed of trust. Thereupon, on July 26, 1904, the trustee filed its bill in a chancery court in Alabama for the purpose of foreclosing the deed of trust, both the Hardwood Co. and Dibert being made defendants to this suit, with other bondholders.

On the next day, July 27th, Wernicke filed on the equity side of the court below a bill to enjoin Dibert's action at law against him on the $35,000 note.

On November 19th a decree was entered in the foreclosure suit in Alabama adjudging Dibert to be the owner of $90,000 of the bonds secured by the deed of trust, and providing that if within thirty days

the Hardwood Co. should not pay these bonds with interest and file a stipulation to pay off the remainder of the bonds, the entire mortgaged property should be sold.

On December 5th Dibert entered into an agreement with the representative of the holder of $37,000 of the Hardwood Co. bonds (the two together representing $127,000 bonds out of the total issue of $147,000), in which it was agreed that Dibert, as trustee, owned $90,-000 of the bonds, and that he should bid at the foreclosure sale such sum, not exceeding $75,000, as might be necessary to buy in the property for the joint benefit of himself, as trustee, and such other holder, in the proportion of 90/127ths and 37/127ths, respectively; with the right, however, in Dibert to bid more than $75,000 for his own account as trustee alone. In accordance with this agreement Dibert bid at the foreclosure sale $25,000; and this being the only bid made, the mortgaged property was sold to him at that price; the syndicate thereby acquiring a 90/127ths in the mortgaged property. He also filed the $90,000 of bonds in the cause, made proof of his ownership thereof, and surrendered them for cancellation; and was allowed the sum of $13,-919.36, the distributive share of such $90,000 bonds, as a credit upon the $25,000 bid by him for the mortgaged property.

The purchasers of this mortgaged property, including the Dibert syndicate, thereafter made unsuccessful efforts to sell it for $100,000, at which price they seem to have held it, the above-mentioned director of the Trust Co. writing in June, 1905, that they would not be willing to sell for $80,000 and then had the price of $100,000 in view. They finally transferred all of the mortgaged property thus purchased to a new company capitalized at $250,000, which took over this and other timber property, receiving in consideration for the Hardwood Co. property $100,000 of the paid-up capital stock of the new company.

There is furthermore affirmative evidence in the record as to the value of the Hardwood Co. properties covered by the deed of trust securing its issue of bonds, consisting in part of the testimony of experienced timber estimators; and in the light of this evidence, which need not be set forth in detail, and all the circumstances in the case, we are entirely satisfied that the fair value of these properties was such that at the time the Trust Co. sold the $90,000 collateral bonds on the Exchange, these bonds were reasonably worth a sum considerably in excess of the debt of $45,000 and interest, for which the Trust Co. then held them as collateral security. We cannot, on this question, regard as conclusive the fact that at the subsequent foreclosure sale these bonds realized only $13,919.36, and think it entirely clear that, under the circumstances under which this sale was made and in view of the previous agreement between the holders of more than six-sevenths of the bonds in reference to bidding in the property for their joint benefit, the fact that they succeeded as the sole bidders in acquiring the property at $25,000, being only one-third of the sum that they were both ready and willing to pay, is of little, if any, evidential weight in determining the real value of the property.

Furthermore, even on the basis on which they were both ready to then bid, the $90,000 of bonds would have been worth about $43,000;

and it is a fair inference that Dibert, who had in the meantime caused a careful examination of the property to be made, contemplated bidding more than this sum for the benefit of the syndicate if the property could not be acquired for a smaller sum.

On May 3, 1906, Dibert filed his answer to Wernicke's bill in the court below, in which he alleged the validity of the sale and purchase of the $90,000 bonds on the New Orleans Stock Exchange and the assignment and delivery of the note and bonds to himself as the owner thereof, and prayed that the bill of complaint be dismissed. Thereafter, the bill being heard on pleadings and proof, the court below entered a decree perpetually enjoining Dibert from the further prosecution of his action at law or any action whatever on said $35,000 note, or from assigning, selling or negotiating the same; from which decree Dibert has appealed to this court.

[1] Under the law of Louisiana, by which the validity of the pledge of the Hardwood Co. bonds is to be governed (Hiscock v. Varick Bank, 206 U. S. 28, 38, 27 Sup. Ct. 681, 51 L. Ed. 945), the provisions authorizing the Trust Co. to sell the bonds without appraisement, advertisement or notice, and to purchase them itself if sold at a stock exchange, were, it is conceded, valid. (Voorhies' Rev. Civ. Code of La. art. 3165 [3132], p. 558; Barry v. American Works, 107 La. 236, 31 South. 733; Denis' Contract of Pledge, sec. 307). And when so authorized by the terms of the pledge, the pledgee may purchase the collateral himself, at a fair price. Barry Bros. v. American Works (La.) supra, at page 240.

[2, 3] However, a mere literal compliance by the Trust Co. with the terms of the pledge, was not sufficient to render valid its sale and purchase of the bonds. As pledgee the Trust Co. occupied a fiduciary relation to the Hardwood Co., the pledgor, as a "trustee to sell," with the duty of exercising its right of sale as the trustee or agent of the pledgor and for the pledgor's benefit as well as its own. Easton v. German-American Bank, 127 U. S. 532, 537, 8 Sup. Ct. 1297, 32 L. Ed. 210; Richardson v. Mann, 30 La. Ann. 1061, 1064. In selling the bonds as pledgee it was required to conduct the sale fairly, in good faith, with due regard to the Hardwood Co., the pledgor, and to exercise reasonable care and diligence in order to secure a just price and conserve the interests of the pledgor, in so far as consistent with its own protection, especially when it at the same time exercised its right of purchasing at the sale; and it could not lawfully conduct the sale, although in technical compliance with the terms of the pledge, in such manner as to enable it to purchase the bonds itself at a wholly inadequate price and at the wanton sacrifice of the interests of the Hardwood Co. Hagan v. Bank, 182 Mo. 319, 331, 81 S. W. 171; Perkins v. Applegate, 85 S. W. 723, 27 Ky. Law Rep. 522, 525; Guinzburg v. Downs Co., 165 Mass. 467, 470, 43 N. E. 195, 52 Am. St. Rep. 525; Jennings v. Moore, 189 Mass. 197, 206, 75 N. E. 214; In re Mertens (2nd Cir.) 144 Fed. 818, 822, 75 C. C. A. 548; Hiscock v. Varick Bank, 206 U. S. 28, 38, 27 Sup. Ct. 681, 51 L. Ed. 945; 31 Cyc. 877; 22 Am. & Eng. Enc. Law (2d Ed.) 885. And see Laclede Bank v. Richardson, 156 Mo. 270, 56 S. W. 1117, 79 Am. St. Rep. 528; Dykers v.

Allen, 7 Hill (N. Y.) 497, 499, 42 Am. Dec. 87; Glidden v. Mechanics' Bank, 53 Ohio St. 588, 599, 42 N. E. 995, 43 L. R. A. 737; and, as to analogous sales by mortgagees, Montague v. Dawes, 14 Allen (Mass.) 369, 373; Foote v. Utah Bank, 17 Utah, 283, 294, 54 Pac. 104; Clark v. Simmons, 150 Mass. 357, 359, 23 N. E. 108; New England Co. v. Wing, 191 Mass. 192, 195, 77 N. E. 376; Bon v. Graves, 216 Mass. 440, 103 N. E. 1023, 1026; Phares v. Barbour, 49 Ill. 370, 373; and Nichols v. Burch, 128 Ind. 324, 327, 27 N. E. 737. In other words, it was the duty of the Trust Co., in selling the bonds as pledgee, to conduct the sale in a fair and diligent manner, tending to secure a reasonable price for the bonds for the benefit of all concerned, and not in such manner as to enable it, under color of a sale, to purchase the bonds at a sacrifice; it was a "trustee to sell," not to buy, though with the privilege of buying, if fairly sold. In Montague v. Dawes (Mass.) supra, at page 373, quoted with approval in Foote v. Utah Bank, supra, 17 Utah at page 295, 54 Pac. at page 106, the court said:

"One who undertakes to execute a power of sale is bound to the observance of good faith, and a suitable regard for the interests of his principal. He cannot shelter himself under a bare literal compliance with the conditions imposed by the terms of the power. He must use a reasonable degree of effort and diligence to secure and protect the interests of the party who intrusts him with the power. * * * When a party who is intrusted with a power to sell attempts also to become the purchaser, he will be held to the strictest good faith and the utmost diligence for the protection of the rights of his principal. If he fail in either, he ought not to be permitted thereby to acquire any irrevocable rights which he can set up against the party whose interests he has sacrificed."

[4] The Trust Co., however, sold the bonds as pledgee with the intention of exercising the privilege of purchasing at its own sale and for the avowed purpose of acquiring ownership. In carrying out this purpose it conducted the sale and purchase in such manner, through the co-operation of its selling and purchasing brokers, and with such lack of publicity and failure to give information in reference to the bonds, as to enable it to acquire them, under color of this sale, at two per cent. of their face value and about four per cent. of the amount of its debt, although willing, if necessary, to bid the full amount of its debt in order to acquire them. And while none of the circumstances surrounding this sale might be sufficient, if taken separately, to render it invalid, we are constrained to hold, under all the circumstances, and in the light of the foregoing authorities, some of which are closely analogous on their facts to the instant case, that this sale was not fairly conducted; that due care and diligence was not exercised by the Trust Co. in securing a fair price for the bonds and in protecting the interests of the Hardwood Co., but that on the contrary, it was intentionally conducted in such manner as to carry out the Trust Co.'s dominant purpose of securing the bonds at the lowest possible price, without regard to the interests of the pledgor; and that, while the sale was technically conducted in the exercise of the power vested under the contract of pledge, nevertheless, by reason of the unfair manner by which this power was exercised and the sale conducted, resulting in the purchase of the bonds by the Trust Co. itself at a grossly inade-

quate price and in wanton sacrifice of their real value, the sale was in derogation of the rights of the Hardwood Co. and invalid, and the purchase of the bonds by the Trust Co. colorable merely. And the fact that such sale in respect to the withholding of information as to the pledged property appears to have been conducted in accordance with the custom of the New Orleans Stock Exchange, is not sufficient to render the sale valid; such custom, when applied to a sale made by a pledgee, being in conflict with the rule of law as to the measure of care and diligence imposed upon a trustee in selling pledged property, especially when he himself becomes the purchaser. See Thompson v. Riggs, 5 Wall. 663, 680, 18 L. Ed. 704; National Bank v. Burkhardt, 100 U. S. 686, 692, 25 L. Ed. 766; Dykers v. Allen, 7 Hill (N. Y.) supra, at page 499, 42 Am. Dec. 87; and 22 Am. & Eng. Enc. Law (2d Ed.) 886, note 1.

The Trust Co., having thus sold the bonds in violation of its obligations as pledgee and at a grossly inadequate price, became liable, in the event it subsequently brought suit against the Hardwood Co. on the note, to account to the Hardwood Co. for the full value of the bonds at the time of the sale, by way of equitable set-off. Phares v. Barbour (Ill.) supra. This liability likewise attaches to Dibert, who purchased the note, after maturity, and with full notice of the equities against it. And the right to such equitable set-off exists in favor of Wernicke as surety. Phares v. Barbour (Ill.) supra, at page 375; Nicholas v. Burch, 128 Ind. 324, 327, 328, 27 N. E. 737 (mortgage). Whether Wernicke, by reason of the form of his endorsement, became a joint maker of the note or an endorser in the strict commercial sense, is clearly immaterial, since he was, both in fact and in law, a surety, having, as the Trust Co. knew, endorsed the note upon the strength of the pledged securities; and the precise form of his endorsement cannot, it is manifest, affect his actual relationship as surety and his right of subrogation incident thereto. Union Bank v. Grant, 48 La. Ann. 18, 21, 18 South. 705; Skud v. Tillinghast (6th Cir.) 195 Fed. 1, 115 C. C. A. 83; Harnsberger v. Yancey, 33 Grat. (Va.) 527. And it appearing from the proof that at the time of such sale the value of the bonds exceeded the amount due upon the note, it results that Wernicke was entitled to an equitable set-off against the note, entirely discharging his liability thereon, and was hence, all other considerations aside, entitled to maintain his bill in the court below, perpetually enjoining the further prosecution of the suit at law upon the note.

[5] The same result likewise follows, in our opinion, upon another ground. So long as the Trust Co., after its invalid sale and purchase of the bonds, retained both the note and bonds in its own possession, and was in a position to have surrendered the bonds to the Hardwood Co. or its sureties, upon tender of payment of the note, although claiming to hold the bonds as purchaser, there was, under the authorities, no wrongful appropriation of the bonds which could have been treated by the Hardwood Co. as a conversion. Glidden v. Mechanics' Bank, supra, 53 Ohio St. 600, 42 N. E. 995; Bank v. Wood, 125 Tenn. 6, 14, 140 S. W. 31. And see Rush v. First Nat. Bank (8th Cir.) 71 Fed. 102, 104, 17 C. C. A. 627; and First Nat. Bank v. Rush (8th Cir.) 85

Fed. 539, 544, 29 C. C. A. 333. However, where the pledgee by an unauthorized disposition of pledged securities places them beyond his reach and puts it out of his power to restore them, this amounts to a conversion; and in such case the pledgor may maintain an action against him for such conversion without an antecedent tender or demand for their return. Rush v. First Nat. Bank (8th Cir.) supra, at page 105; Glidden v. Mechanics' Bank (Ohio) supra, at page 602. Or, if sued by the pledgee upon the debt, he may, without such antecedent tender, set off or recoup the full value of the securities thus converted, the debt, being to such extent discharged. Skud v. Tillinghast (6th Cir.) supra, at pages 4, 8; Rush v. First Nat. Bank (8th Cir.) supra, at page 105. And see Phares v. Barbour (Ill.) supra. And this defense is likewise available to an accommodation maker, endorser or surety, when sued upon the debt. Skud v. Tillinghast (6th Cir.) supra; Sitgreaves v. Bank, 49 Pa. 359, 364.

In the present case the Trust Co., after buying the bonds under the invalid sale upon the Stock Exchange, thereafter claimed to own the bonds absolutely, as purchaser, and to hold them no longer as pledgee. It subsequently sold the bonds, as such absolute owner, to the syndicate, thereby placing it beyond its own power to return the bonds upon tender of the debt. And while it also sold the syndicate the note, it did not transfer the bonds as collateral security, incidental to the transfer of the note, but sold and transferred them separate and distinct from the note, and under its claim of absolute ownership. The syndicate thereafter, through Dibert, likewise asserted complete ownership and exercised actual dominion over the bonds in a manner inconsistent with any holding of them merely as collateral security incident to its purchase of the note. Dibert first brought suit against Wernicke on the note, in which he claimed there was no other credit on the note than the $1,400 credit of January 21, 1904, which had been realized from the sale of the bonds on the stock exchange, thereby necessarily asserting the validity of the sale. He subsequently filed the bonds, with claim of ownership, in the foreclosure suit, and was adjudged to be the owner thereof. He received the pro rata share of the bonds from the proceeds of the foreclosure sale and surrendered the bonds for cancellation. He not only did not credit such proceeds on the note, but, on the contrary, subsequently filed his answer in the court below in which he explicitly asserted the validity of the sale upon the stock exchange and impliedly, at least, insisted that the note was entitled to no other credit than the $1,400 received for the bonds at such sale.

After careful consideration we are of opinion that the sale of the bonds by the Trust Co. to the syndicate, separate and apart from the note, under a claim of actual ownership and in the exercise of complete dominion over the disposition of the bonds, constituted a wrongful appropriation and conversion of the bonds, inconsistent with the pledge (McPheters v. Page, 83 Me. 234, 235, 22 Atl. 101, 23 Am. St. Rep. 772), and that such conversion by the Trust Co. in the sale of the bonds to the syndicate, supplemented and emphasized by the subsequent conduct of Dibert, as the representative of the syndicate, in

his assertion of complete and absolute dominion over the bonds under the claim of ownership, entitled Wernicke, as surety on the note, under the authorities above cited, to set off, by reason of such conversion, the full value of the bonds against the amount otherwise due upon the note; and that hence, such value being in excess of the amount due upon the note, he was, for this reason, without antecedent tender of the balance due upon the note, entitled to maintain his bill to enjoin the further prosecution of the suit upon the note.

We cannot regard the case of Easton v. German-American Bank (U. S.) supra, upon which Dibert places his chief reliance, as applicable to the facts in this case. There a creditor, who held as collateral security for the payment of his debt, certain bonds secured by a deed of trust, because one of the purchasers of the property at a foreclosure sale made by the trustee, under the deed of trust, the fairness of which was not questioned, and promptly credited the debt with the full amount of the proceeds of the bonds realized at such foreclosure sale. The holding that under such circumstances his purchase of the property at the foreclosure sale made by the trustee, was valid and did not enure to the benefit of the debtor, is clearly distinguishable from the instant case, in which Dibert did not receive the proceeds of the bonds at the foreclosure sale as the proceeds of property held as collateral security and credit such proceeds on the note, but, on the contrary, claimed such proceeds as his own property, as the absolute owner of the bonds, and thereafter, in his answer to the bill in the court below, in effect, asserted the right to collect from Wernicke the full balance claimed upon the note without any credit whatsoever by reason of the sum which he had received as the proceeds of the bonds at the foreclosure sale.

For analogous reasons we are of opinion that the conduct of the Trust Co. and of the syndicate in the matter of the sale of the bonds upon the Stock Exchange, the sale to the syndicate and the subsequent dealings of the syndicate in reference thereto, constituted such an incumbrance upon Wernicke's right of immediate subrogation, as to discharge him as surety upon the note, under Art. 3061 of the Louisiana Code, providing that: "The surety is discharged when the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety." Voorhies' Rev. Civ. Code of La. (Saunders' Ed. 1889) p. 543. And see New England Co. v. Randall, 42 La. Ann. 261, 7 South. 679.

We are likewise of opinion that Dibert is not now entitled to collect the remainder of the note, after crediting thereon the $13,919.36 received as the proceeds of the bonds in the foreclosure sale. This cannot, we think, be allowed upon the theory upon which he now insists, that, even if the Stock Exchange sale was invalid, the syndicate is to be regarded as being, after its purchase, the owner of the note, holding the bonds as collateral security therefor, and that he is therefore to be treated as having lawfully collected as pledgee the proceeds of the bonds arising from the foreclosure sale, under the doctrine of Easton v. German-American Bank (U. S.) supra. Dibert did not, however, in fact, after his purchase of the bonds, hold them as collateral to the

note, but held them under a distinct claim of absolute ownership; and he did not in fact collect the proceeds as pledgee and apply the same as a credit on the note; but, on the contrary, he collected the proceeds under his claim of ownership, without giving any credit upon the note, and, in effect, asserted in his answer in the court below the right to collect the full amount claimed on the note, without any credit of the character. It is now too late to insist in this court, on appeal from an adverse decree, upon an entirely different and inconsistent theory, and to obtain here a benefit in the recognition and enforcement of a pledge, which he in fact distinctly repudiated, and upon a theory which is directly inconsistent both with his conduct and the theory of his pleadings in the court below, and supported by no appropriate pleadings whatever.

We find no error in the decree below. The same will accordingly be in all things affirmed, and the appeal dismissed, with costs.