HALL, Judge.
Joseph C. Elmer, the pledgor of 700 shares of the capital stock of Elmer Candy Corporation brought this proceeding against Oscar B. Elmer, the pledgee thereof, seeking to set aside the sale and/or adjudication of the pledged stock by Oscar B. Elmer unto himself, and seeking the return of the pledged stock upon depositing in the registry of the court a sum equal to the amount of his obligation to Oscar B. Elmer, pledgee. Plaintiff also prayed for an injunction against Oscar B. Elmer and Elmer Candy Corporation which, generally speaking, would have the effect of restoring the status quo which existed between plaintiff and Oscar B. Elmer, as of September 23, 1964, with regard to their rights and privileges in Elmer Candy Corporation.
Following an extensive trial on the merits judgment was rendered annulling and setting aside the sale of the pledged stock by Oscar B. Elmer unto himself and declaring same to be of no effect. The judgment further ordered that Oscar B. Elmer transfer to plaintiff the 700 shares of stock acquired by him at such pretended sale and return to plaintiff the note held by him against which the stock was pledged, upon payment by plaintiff to Oscar B. Elmer of the full amount of said note plus the interest due thereon according to its terms (but without attorney’s fees). The judgment further ordered in detail the steps by which this was to be accomplished by Oscar B. Elmer and Elmer Candy Corporation, and permanently enjoined them from doing anything to alter the rights of any of the shareholders of record of the corporation as of September 23, 1964, until plaintiff and Oscar B. Elmer shall have been restored to the status quo which existed between them in regard to their rights and privileges in Elmer Candy Corporation prior to September 23, 1964.
Oscar B. Elmer and Elmer Candy Corporation appealed. Elmer Candy Corporation filed no brief and made no appearance in this Court (although its attorneys were physically present in the courtroom during the argument). Its appeal is hereby dismissed under the provisions of Section *393 5(b) of Rule VII of the Uniform Rules of the Courts of Appeal.
The record reveals the following:
Elmer Candy Company, an old establishéd New Orleans business, underwent reorganization in July 1964 and as a result thereof a new corporation was formed styled “Elmer Candy Corporation”, with a total authorized capital stock of 7,500 shares having a par value of $100.00 each, of which 2,000 shares were allotted to plaintiff, Joseph C. Elmer and 2,000 shares were allotted to Supreme Broadcasting Co., Inc., a corporation wholly owned by Roy Nelson and/or his wife, Mrs. Flora S. Nelson.
In order to complete payment for his shares Joseph C. Elmer borrowed the sum of $70,000.00 from Oscar B. Elmer, his uncle, and as evidence of said loan Joseph C. Elmer and his wife, Ruth M. Elmer, executed a promissory note dated September 15, 1964, payable to the order of Oscar B. Elmer in the principal sum of $70,000.00 bearing interest at the rate of 6% per annum from September 15, 1964 until paid, payable in five annual installments of $14,000.00 each, the first installment being due on September 15, 1965. This note was secured by 700 shares of the capital stock of Elmer Candy Corporation represented by certificate no. 5 issued in the name of Joseph C. Elmer and by him endorsed in blank.
As of September 23, 1964 there were only two stockholders of Elmer Candy Corporation viz. Joseph C. Elmer and Supreme Broadcasting Co., Inc., each owning 2,000 shares of the stock. The stock owned by Joseph C. Elmer was represented by two certificates to wit: certificate no. 5 for 700 shares (held in pledge by Oscar B. Elmer) and certificate no. 6 for 1,300 shares.
Prior to the due date (September 15, 1965) of the first installment of the note Joseph C. Elmer requested an extension of time for payment. The extension was not granted, the installment fell due, and was not paid. At the close of business on September 15, 1965 Harry Nowalsky (attorney for Oscar B. Elmer) sent a letter of default to Mr. and Mrs Joseph C. Elmer demanding “immediate payment” of the full amount of the note together with interest and attorney’s fees as therein provided.
Thereafter additional requests for extensions were made as hereinafter noted. On Saturday, September 18, 1965, Oscar B. Elmer instructed his attorney to exercise his rights under the pledge. The end result was the acquisition by Oscar B. Elmer of the 700 shares of pledged stock as, and in the manner, hereinafter set forth.
Practically the entire record is devoted to an attempt by plaintiff to prove that an extension of time for payment was granted by Oscar B. Elmer and/or that Oscar B. Elmer was estopped from selling or disposing of plaintiff’s pledged stock without giving him prior notice of his intention to do so. Other issues were presented to the Trial Court and argued before us, such as whether the transfer of the stock to Oscar B. Elmer violated certain restrictions on the sale and transfer of stock contained in the charter of Elmer Candy Corporation and certain other restrictions contained in a “Buy and Sell Agreement” entered into between Joseph C. Elmer and Supreme Broadcasting Co., Inc., the only two stockholders of the corporation. We find it unnecessary for us to discuss either the testimony concerning these matters or the conclusions to be drawn therefrom because the view we take of the sale and/or adjudication of the pledged stock by Oscar B. Elmer to himself is dispositive of the case.
The note contains the following provisions :
“In the event that this note is not paid at its maturity or in the event that the makers, endorsers or any party hereto, should fail in business or become *394 insolvent or should apply to be adjudged a bankrupt or proceedings in involuntary bankruptcy be filed against them, or the appointment of a receiver should be filed against them, or any one of them, or application for respite be made, this note shall immediately become due and payable without demand or notice or putting in default.
“In case of non-payment of this note or any of its installments at its maturity, or when otherwise due, as herein provided, the holder hereof is hereby irrevocably authorized to sell said securities or property or any part thereof, at public or private sale without recourse to judicial proceedings, and without either demand, appraisement, advertisement or notice of any kind, and, at its option, to become the purchaser at said public or private sale, or to acquire said securities or property, or any part thereof, at their market value, and holder hereof is hereby irrevocably authorized to make any transfers or deliveries to the purchaser or purchasers at such public or private sale of any securities or property herein pledged, and to apply the proceeds thereof (1) to the payment of all costs and commissions for selling; (2) to the payment of this note in principal, interest ■and ten per cent (10%) attorneys fees (with a minimum of $50.00), or to any other debt, liability or obligation, direct or contingent up to the amount herein-above stated, then due or thereafter to become due by parties hereto, or any of them.”
Such provisions in a note authorizing the holder, in the event of a default in payment thereof, to sell securities held in pledge thereunder at private sale without recourse to judicial proceedings and without demand or notice, and authorizing the holder to become the purchaser at such sale are not in themselves invalid. (See LSA-C.C. Art. 3165; In re: Liquidation of Hibernia Bank & Trust Co., 205 La. 890, 18 So.2d 330; Berry v. American White Lead & Color Works, 107 La. 236, 31 So. 733; Hiscock v. Varick Bank of New York, 206 U.S. 28, 27 S.Ct. 681, 51 L.Ed 945; 41 Am.Jur. § 93 p. 651; See also annotation, 76 A.L.R. at p. 716.) However such provisions may not be used as a cloak for what amounts to an appropriation or forfeiture by the pledgee of the subject of the pledge (See Alcolea v. Smith, 150 La. 482, 90 So. 769. See also 33 Tulane Law Review at page 114.)
A mere literal compliance with the terms of the pledge is not in itself sufficient to render valid the sale and purchase by the pledgee of the subject of the pledge, since the pledgee occupies a fiduciary relation to the pledgor, being regarded as a trustee or agent of the pledgor in making the sale, owing the pledgor the duty of acting fairly and in good faith. (See 72 C.J.S. Pledges § 60(3), p. 123; Dibert v. Wernicke, 214 F. 673; State Trust & Savings Bank v. Dunn, 5 Cir., 24 F.2d 477, reversed on other grounds in 278 U.S. 582, 49 S.Ct. 184, 73 L.Ed. 518; Wade v. Markwell & Company, 118 Cal.App.2d 410, 258 P.2d 497, 37 A.L.R.2d 1363.)
The rule is stated in 41 Am.Jur. § 94 p. 651 as follows:
“§ 94. Incidents of Sale; Fairness of Transaction. — The validity and efficacy of a purchase of the subject of a pledge by the pledgee, under an agreement authorizing the purchase, must be determined solely on the facts of each case and all the attendant circumstances, and cannot be made the subject of a specific rule. It may be said, however, that the cases show that regardless of how unlimited the power and authority of a pledgee to purchase the pledged property may be, he will be held to the strictest good faith in dealing with it, and will not be permitted wantonly to sacrifice it for his own benefit. His position is generally held to be that of a fiduciary, and the fact that the power to purchase is conferred on him will not relieve him of his duties as a trustee to sell. *395 Although mere inadequacy of the price at which the subject of the pledge was purchased does not of itself show lack of good faith or due care, and although no notice of the sale need be given to the pledgeor or the public when the pledge agreement waives such requirement, yet such circumstances, when weighed together with other facts which indicate that the pledgee is not attempting to realize the amount of the debt by the sale, but is merely attempting to secure for himself the full title to the property at the lowest possible price, are generally held to show a dealing with the property incompatible with the pledgee’s fiduciary character, which will warrant the court in holding the sale and purchase invalid. * * * ”
(See also annotations in 76 A.L.R. 722; 109 A.L.R. 1109; 37 A.L.R.2d 1392 and cases therein cited.)
In the instant case the facts and circumstances surrounding the acquisition by Oscar B. Elmer of the pledged stock are as follows:
Following default in the payment of the first installment of the note as previously noted herein, and following receipt of Mr. Nowalsky’s letter of September IS, 1965 demanding “immediate payment” of the full amount of the note plus interest and attorney’s fees, Joseph C. Elmer made efforts through his attorney, J. B. Kiefer, to obtain an extension of time in which to pay the note in full. On Friday, September 17, 1965, Mr. Kiefer and Mr. Nowalsky engaged in a telephone conversation in which the matter of an extension was discussed at length. The result of this discussion is in dispute.
Mr. Kiefer testified that an extension of ten days was arranged conditioned upon the execution of a confession of judgment in favor of Oscar B. Elmer. Mr. Nowalsky and Oscar B. Elmer, who was present in Mr. Nowalsky’s office during the telephone conversation, testified that all pleas for an extension of time for payment were refused. We find it unnecessary in our view of the case to decide whether an extension was refused by Oscar B. Elmer or whether he led Kiefer to believe an extension would be granted and later changed his mind.
At any rate on the morning following this telephone discussion viz. on Saturday morning, September 18, 1965, Oscar B. Elmer telephoned Mr. Nowalsky at his home and told him that he wanted to acquire the collateral and cancel the note. Mr. Nowalsky wished to discuss the matter further with his client and, although his office was customarily closed on Saturday made an appointment to see Oscar B. Elmer in his office that afternoon. He instructed his client to bring with him some evidence of the value of the collateral because he “wanted to be sure the equities were fair” before he would recommend the acquisition of the stock in payment of the note. Oscar B. Elmer replied that he would bring Roy A. Nelson, the president of Elmer Candy Corporation, with him.
The three met in Mr. Nowalsky’s office that Saturday afteroon. No one else was present. Upon arriving at the office Oscar B. Elmer handed Mr. Nowalsky a type-written document signed by him instructing Mr. Nowalsky to acquire the collateral and have the note cancelled and consider it paid. Mr. Nelson informed Mr. Nowalsky that the pledged stock had a book value of $100.00 to $110.00 per share, and after making some calculations Mr. Nowalsky was satisfied to carry out his client’s instructions, but wished first to inform Mr. Kiefer. Mr. Kiefer could not be reached by telephone and the result was that neither Mr. Kiefer nor his client was given any notice of Oscar B. Elmer’s intention.
Mr. Nowalsky worked that afternoon and part of Sunday preparing three documents in long hand which he placed on his secretary’s desk for typing on Monday.
*396 The three documents, all of which bear the date September 20, 1965 are as follows :
a) a letter addressed to Elmer Candy Corporation enclosing the pledged stock certificate and requesting the issuance of a new certificate for 700 shares of stock in the name of Oscar B. Elmer,
b) a waiver by Mr. and Mrs. Roy A. Nelson and Supreme Broadcasting Company of all of their rights in the “Buy and Sell Agreement” and
c) a letter addressed to Mr. and Mrs. Joseph C. Elmer informing them that “ * * * Mr. Oscar B. Elmer has seen fit to adjudicate and/or sell said security to himself, for its market value, which amount he is accepting in full and complete satisfaction and payment of all your obligations under the aforesaid note and which note will be marked ‘Paid’ and can-celled and delivered to you at your request.” .
These three documents prepared over the weekend constitute the “sale” of the pledged stock. They were signed and delivered by hand on Monday, September 20, 1965. The only persons present at the signing were Oscar B. Elmer, Mr. and Mrs. Roy Nelson and Mr. Nowalsky, all of whom had interests adverse to Joseph C. Elmer. Joseph C. Elmer’s certificate of stock theretofore held in pledge by Oscar B. Elmer was cancelled by Elmer Candy Corporation and a new certificate for 700 shares was issued in the name of Oscar B. Elmer and delivered to him on Tuesday, September 21, 1965.
In the afternoon of Monday, September 20, 1965, Joseph C. Elmer, having arranged a sufficient loan from the Hibernia National Bank, called on Oscar B. Elmer and offered immediate payment of the full amount of the note plus interest and attorney’s fees. This offer was made subsequent to the “adjudication and/or sale” of the pledged stock which had taken place that morning and was refused by Oscar B. Elmer who stated he was not interested in payment of the note; that he had the stock.
The provisions of the note required any sale of the collateral to be at “market value”. However the corporation had only two stockholders, the stock was closely held, was unlisted, and untraded in. It’s “market value” was indeterminable. As to its worth, Mr. Colon, an officer of the Hibernia National Bank, testified that in his opinion 1,300 shares of the stock had a value for loan purposes of $200,000.00 which figures out at $153.84 per share. The book value of the stock, as shown by the corporation’s balance sheet as of the fiscal year ended August 31, 1965, was $126.28 per share which would make the 700 pledged shares have a book value of $88,396.00. As of the date of the “adjudication and/or sale” to Oscar B. Elmer, a total of $81,260.00 was due on the note held by him including principal, interest and attorney’s fees. Oscar B. Elmer therefore acquired the stock at $7,136.00 less than its book value.
The record overwhelmingly shows an utter disregard by the pledgee of the rights of the pledgor. Oscar B. Elmer’s sole motivation throughout was to obtain possession of the stock. Even before the maturity of the first installment on the note he informed the president and another officer of the Hibernia National Bank there might be some changes in the organization of Elmer Candy Corporation, since he was sure Joe would not be able to pay the note held by him and that he “was going to take Joe’s stock”. As a matter of fact Oscar B. Elmer made no pretense about it. He himself testified that he decided on September 15, 1965 at 3 P.M. when the first installment came in default to adjudicate the stock to himself. He further testified that “September 15th at 3:00 o’clock I became owner of the stock”, and that the value of the stock was of no concern to him. He further stated that he went to Nowalsky’s office on Saturday, September 18, 1965 to notify him *397 “definitely and thoroughly I wanted to take possession of the stock. I was disturbed about it.” More of his testimony to the same general effect could he cited. He had no interest whatever in the payment of the note or in conducting a fair sale of the stock. His stole interest was in acquiring the stock for himself. For a somewhat similar situation see Dibert v. Wernicke, 6 Cir., 214 F. 673.
In this connection the Trial Judge said in his written “Reasons for Judgment”:
“It is also obvious to the Court that it was Oscar Elmer’s intention to try to obtain the ownership of the stock of Joseph Elmer, and not the payment of the indebtedness which was due him, in order to gain a large voice in the management of the company and to divest the same from Joseph Elmer. Equity and good conscience will certainly not allow this to be done by the means that it was attempted here.”
In our opinion the “sale” of the stock for the price and in the manner and for the purpose it was made shows a “dealing with the property incompatible with the pledgee’s fiduciary character.” The pretended sale amounted to no more than an appropriation by the pledgee of the subject of the pledge to serve his own personal ends and should be set aside. We note parenthetically that Oscar B. Elmer not only took possession of the pledged stock but also retained and still has in his possession Mr. and Mrs. Joseph C. Elmer’s uncancelled note.
Counsel for Oscar B. Elmer contends that if the sale is rescinded his client is entitled to be paid the 10% attorney’s fees stipulated in the note as well as the principal and interest due thereon. The answer to this contention is that the note contains no provision for attorney’s fees except the provision quoted herein permitting the application of part of the proceeds of the sale of the collateral to the payment of attorney’s fees. There being no valid sale, no attorney’s fees are due.
For the foregoing reasons the judgment appealed from is affirmed; costs of both Courts to be borne by defendant-appellant.
Affirmed.